155 F.3d 596
 Allan TILTTI, Anthony Coppola, Norman Mentzel, Martin
Witriol, Alexander Jaszenko, Michael Serak, Vonzell Harris,
Christopher James, Whitley Azure, Kenneth Bagby, and Leonard
Dobis, Plaintiffs-Appellants,
v.
George WEISE, as Commissioner, Department of the Treasury,
Robert E. Rubin, Department of Treasury, and
United States Customs Service,
Defendants-Appellees.
 No. 650, Docket 97-6078.
 United States Court of Appeals,
 Second Circuit.
Argued Nov. 20, 1997.
Decided Sept. 14, 1998.
 
 Lloyd Somer, New York City, for Plaintiffs-Appellants.
 Pierre M. Gentin, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney and Marla Alhadeff, Assistant United States Attorney for the Southern District of New York, on the brief), for Defendants-Appellees.
 Before: KEARSE, OAKES and FRIEDMAN*, Circuit Judges.
 FRIEDMAN, Circuit Judge:
 
 
 1
 The appellants, 11 present and former Customs Patrol Officers (Patrol Officers) of the United States Customs Service (Customs), challenge the district court's dismissal of their amended complaint seeking to overturn Customs reassigning them to different geographical locations. The district court dismissed the first claim for relief for lack of subject matter jurisdiction, and the second claim for relief for failure to state a claim upon which relief could be granted. The Patrol Officers' appeal challenges only the dismissal of the first claim for relief. We affirm.
 
 I.
 
 2
 A. The underlying facts are not disputed. By letters dated March 21, 1995, Customs' Assistant Commissioner of its Office of Investigation informed all Patrol Officers, then numbering 16, that they were being reassigned to offices along the southwestern border of the United States. Those 16 Officers were then working in New York, New Jersey, Florida, Virginia, and Texas. The letter listed eight reassignment locations (two in California and three each in Arizona and Texas) for which the Patrol Officers were asked to indicate their preference.
 
 
 3
 The letter stated that if the Patrol Officer "decline[d] this reassignment," Customs would initiate proceedings to remove the officer and that if the officer faced mandatory retirement (at age 57) or was eligible to retire by March 30, 1996, the officer could do so instead of transferring. The Patrol Officers were to inform Customs of their decision within 15 days of receipt of the letter, and failure so to reply "w[ould] be considered a declination."
 
 
 4
 The opening paragraph of the letter explained the reassignment:
 
 
 5
 Within the last year, the Administration and the Customs Service have recognized a need to strengthen our presence along the Southwest Border. Specifically, there is a critical need to intensify interdiction and other enforcement operations at a number of border locations. In order to establish a stronger enforcement posture along the Southwest Border, we are directing the reassignment of all Customs Patrol Officers, not currently on or near the Southwest Border, to offices along the border where their expertise and training can be more effectively utilized.
 
 
 6
 A declaration by the Customs official who was "the principal staff officer responsible for the development and implementation of the 1995 plan to reassign all Customs Patrol Officers ('CPOs') throughout the United States to positions on the Mexican-American/Southwest Border of the United States (the 'Southwest Border')" stated:
 
 
 7
 In 1985, the drug smuggling threat on the Southwest Border increased. In the mid-late 1980's all CPOs assigned to the Boston, Philadelphia, and Baltimore field offices were reassigned to the Southwest Border in order to counter the threat on that border. No action was taken at that time to reassign CPOs from other locations such as New York, because of the belief that sufficient threat continued to exist to warrant retention of those CPOs within their regions....
 
 
 8
 In 1995, as the drug smuggling threat on the Southwest Border continued to increase, and because there was little or no identifiable threat of drug smuggling between the Ports of Entry along the East and West Coasts or along the Canadian border, action was initiated to reassign all CPOs nationwide to the Southwest Border. This decision was made because the greatest need for CPOs is on the Southwest Border.
 
 
 9
 Of the 11 appellant Patrol Officers who received reassignment notices, 2 accepted reassignment and the other 9 elected to retire.
 
 
 10
 B. In March 1996, 10 of the Patrol Officers filed the present suit in the United States District Court for the Southern District of New York against the Commissioner of Customs. The complaint alleged that the Commissioner had "acted arbitrarily, capriciously, and illegally" in reassigning the Patrol Officers, and that the reassignment was "an adverse action and/or a reduction in force" and was "intended to force the resignations or the retirement of the [Patrol Officers] from federal service." The complaint stated that it was "a suit for a preliminary and a permanent injunction preventing the defendant from mandating the reassignment of the CPOs to the Southwest Border."
 
 
 11
 The district court denied a preliminary injunction barring Customs from enforcing the reassignment order. The court held that the plaintiffs had failed to show either a likelihood of success on the merits or irreparable injury.
 
 
 12
 Two days before the district court's ruling, the Patrol Officers filed with the Office of Special Counsel a complaint against Customs seeking "an immediate investigation into the allegations that the agency has acted improperly ... based on a directive dated March 21, 1995 in which all the CPOs were ordered to report to the Southwest Border of the United States, or be terminated." The complaint requested that the Special Counsel "move to prevent the forced resignation, forced retirement, and/or reassignment of the CPOs." Enclosed with the complaint were copies of two affidavits the Patrol Officers had filed in the district court in support of the motion for a preliminary injunction describing their contentions in detail.
 
 
 13
 Almost eight months later, the Office of Special Counsel informed the Patrol Officers that it had "made a preliminary determination to close the investigation into this matter." The Special Counsel stated:
 
 
 14
 It appears that the Service assessed a need in the Southwest for stepped-up interdiction, a service that Custom Patrol Officers could readily provide. While you believe that you had no other choice but to retire, it does not appear that the Service coerced your retirement. In fact, the Service gave you three alternatives to reassignment to the Southwest. We found no facts suggesting that the Service asked you to retire, or that there were any adverse actions pending against you. Further, it does not appear that you were under any time pressure to retire, because it appears that you were allowed fifteen days to make your decision.
 
 
 15
 Six months after the district court denied a preliminary injunction, the Patrol Officers (their number increased to 11) filed an amended complaint, which contained two claims for relief. The first claim for relief asserted that as a result of Customs' arbitrary, capricious, and illegal actions in ordering the reassignments, nine of the Patrol Officers had been coerced into retiring and the other two into relocating. The amended complaint based jurisdiction over this claim on 28 U.S.C. § 1331 (1994) and on the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1994). The second claim for relief charged that the reassignments violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (1994). The relief requested included the return to duty of the Patrol Officers "who were forced to retire on March 30, 1996," that any Patrol Officers who transferred to the Southwest Border as a result of the March 21, 1995 reassignment "be allowed to return to their former job duty positions," that the reassignment directive "be stricken and declared null and void," and that the Patrol Officers be retroactively promoted.
 
 
 16
 On the government's motion, the district court dismissed the amended complaint. The court held that it lacked jurisdiction under the Administrative Procedure Act for the reason it had stated in denying a preliminary injunction: "The APA makes plain the intent of Congress which was clearly and unequivocally to preclude direct appeal to the federal courts of agency decisions."
 
 
 17
 The court ruled that it had no jurisdiction under the Civil Service Reform Act of 1978 (Reform Act), Pub.L. 95-454, 92 Stat. 1111 et seq. (codified in various provisions of Title 5 of the United States Code), because under that Act "when a reassignment is made for alleged impermissible reasons, such as with the allegations here, the aggrieved federal employee has a single remedy, i.e. he may petition the Office of Special Counsel ('OSC') and seek an investigation of the claim. Under the CSRA's comprehensive remedial scheme, judicial review is 'limited, at most, to insuring compliance with the statutory requirement that the OSC perform an adequate inquiry.' " (citations omitted) The court noted that the Patrol Officers had sought relief from the Office of Special Counsel, which ruled that "the Customs Service had not committed any improper act." The court further noted that "[n]owhere in plaintiffs' complaint or moving papers do they request that this Court review OSC's actions to insure that its inquiry complied with the statutory requirement."
 
 
 18
 Finally, the court rejected the Patrol Officers' argument that it had jurisdiction because the reassignments were made in retaliation for the officers' exercise of their First Amendment right to discuss various issues relating to their employment. The court stated that the Reform Act "does not preclude judicial review of a federal agency's actions where the plaintiff asserts such actions violated his constitutional rights," but that First Amendment protection requires that the employee be addressing matters of public interest rather than the employee's own private concerns. After reviewing the statements that the Patrol Officers contended constituted an exercise of their First Amendment rights, the court held that those statements "concerned matters of private interest rather than those of public concern."
 
 
 19
 The court dismissed the second claim for relief, alleging violations of the Age Discrimination in Employment Act, for failure to comply with the procedural requirements of that Act. Since the Patrol Officers do not challenge that ruling, we do not further discuss it.
 
 II
 
 20
 A. In United States v. Fausto, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), the Supreme Court explored the relationship between the structure of and the remedies under the Reform Act and the litigation of federal employee issues in other forums. The question was whether a federal employee could maintain a suit in the United States Claims Court for back pay under the Back Pay Act based upon his allegedly improper suspension, when he could not have challenged that action under the administrative procedures of the Reform Act. The Court of Appeals for the Federal Circuit ruled that he could maintain the suit. The Supreme Court reversed, holding that the Reform Act precluded the Claims Court suit.
 
 
 21
 The Supreme Court stated that "[a] leading purpose of the [Reform Act] was to replace the haphazard arrangements for administrative and judicial review of personnel action" that previously had characterized "the civil service system," "with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." Id. at 444-45, 108 S.Ct. 668. Fausto was a nonpreference employee in the excepted service of the civil service system, and therefore had fewer rights and protection than employees in the competitive service. See id. at 441 n. 1, 108 S.Ct. 668. The Court pointed out that "[t]hree main sections of the [Reform Act] govern personnel action taken against members of the civil service. In each of these sections, Congress deals explicitly with the situation of nonpreference members of the excepted service, granting them limited, and in some cases conditional, rights." Id. at 445, 108 S.Ct. 668. The Court noted that none of those sections gave nonpreference excepted employees the right to seek either administrative review or judicial review of a disciplinary suspension of the type that Fausto was challenging. The Court concluded:
 
 
 22
 The [Reform Act] established a comprehensive system for reviewing personnel action taken against federal employees. Its deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents respondent from seeking review in the Claims Court under the Back Pay Act.
 
 
 23
 Id. at 455, 108 S.Ct. 668.
 
 
 24
 The basic principle announced and applied in Fausto is that the Reform Act's "comprehensive system for reviewing personnel action taken against federal employees" provides the exclusive remedy by which those employees may challenge such actions and, unless the Reform Act either explicitly or by necessary implication sanctions judicial challenges to such actions, judicial challenge is foreclosed. See, e.g., Ryon v. O'Neill, 894 F.2d 199, 202-04 (6th Cir.1990); Carducci v. Regan, 714 F.2d 171, 175 (D.C.Cir.1983) (holding limited to non-constitutional claims).
 
 
 25
 The Patrol Officers' complaint in this case challenges their reassignment to a different geographical location, at the same grade and pay they had at their prior location. In the case of "adverse action" against a government employee, the Reform Act "provides formal proceedings before the agency, and appeal to the Merit Systems Protection Board, and judicial review in the Court of Appeals for the Federal Circuit." Carducci, 714 F.2d at 173 (citations omitted). The Merit Systems Protection Board (Board) has no jurisdiction, however, to review a reassignment of an employee to a new location at the same pay and grade, because such reassignment is not an adverse action. See Manning v. Merit Sys. Protection Bd., 742 F.2d 1424, 1427 (Fed.Cir.1984); Thomas v. United States, 709 F.2d 48, 50 (Fed.Cir.1983). The geographical assignment of individual employees is ordinarily within the discretion of the employing agency. See Urbina v. United States, 209 Ct.Cl. 192, 530 F.2d 1387, 1390 (1976).
 
 
 26
 The Reform Act does provide a method by which government employees may challenge such reassignment orders: the employee may file a petition with the Office of Special Counsel. 5 U.S.C. §§ 1212(a)(2), 1214(a)(1)(A) (1994). The Special Counsel must investigate "any allegation of a prohibited personnel practice ... to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." 5 U.S.C. § 1214(a)(1)(A). A "prohibited personnel practice" is defined to include "a detail, transfer, or reassignment" made for an impermissible purpose as specified in the Act. 5 U.S.C. § 2302(a)(2)(A)(iv), (b) (1994 & Supp. II 1997). If the Special Counsel determines that there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is likely to take place, the Special Counsel may request the agency to take corrective action and, if that is not done, may petition the Board for such action. 5 U.S.C. § 1214(b)(2)(B), (C).
 
 
 27
 If the Special Counsel terminates the investigation, the employee who initiated it is told the reason for such action. 5 U.S.C. § 1214(a)(2)(A). "Judicial review of an [Office of Special Counsel] decision is limited, at most, to insuring compliance with the statutory requirement that the OSC perform an adequate inquiry on which to base its disposition of an employee's petition." Cutts v. Fowler, 692 F.2d 138, 140 (D.C.Cir.1982).
 
 
 28
 The Patrol Officers followed that procedure in the present case, by filing a complaint with the Office of Special Counsel challenging their reassignment as coerced. After investigation, however, the Office of Special Counsel concluded that the facts did not support that allegation and terminated the investigation. Since the Patrol Officers did not challenge the adequacy of the investigation, no judicial review of the Special Counsel's determination is available.
 
 
 29
 Other circuits have held that the Reform Act precludes a district court from reviewing under the Administrative Procedure Act an agency's reassignment of an employee. See, e.g., Broadway v. Block, 694 F.2d 979, 986 (5th Cir.1982); Ryon 894 F.2d at 202-04 (6th Cir.1990); Weatherford v. Dole, 763 F.2d 392, 393-394 (10th Cir.1985); Carducci, 714 F.2d at 172 (D.C.Cir.1983). We agree with those decisions and adopt the same rule for this circuit. Accordingly, the district court correctly dismissed for lack of jurisdiction the Patrol Officers' first claim for relief under the Administrative Procedure Act challenging their reassignment.
 
 
 30
 B. The Patrol Officers also contend that the reassignments were a disguised reduction in force that was made without following the prescribed procedures for taking such action.
 
 
 31
 The record, however, does not sustain the Patrol Officers' contention that the reassignments constituted a reduction in force, which occurs when an agency terminates its employees to reduce the size of its work force. See Grier v. Department of Health and Human Servs., 750 F.2d 944, 945 (Fed.Cir.1984) ("The [reduction in force] regulations ... provide the administrative process through which the government eliminates jobs and deals with the employees who formerly occupied the abolished positions."). The reassignments were not designed to reduce the number of Customs' employees, but to transfer employees to locations where Customs concluded they were more needed--as Customs had done ten years earlier in reassigning other Patrol Officers from other locations to the Southwest Border. The Patrol Officers were not subject to a reduction in force. See Krizman v. Merit Sys. Protection Bd., 77 F.3d 434, 439 (Fed.Cir.1996) ("[T]he reorganization as a whole was not a [reduction in force]; only those employees who were assigned to lower-graded positions as a result of the reorganization were subjected to [reduction in force] actions.").
 
 III
 
 32
 The Patrol Officers argue that in any event the district court had jurisdiction under 28 U.S.C. § 1331 over their first claim for relief insofar as it alleged that their reassignment violated their First Amendment rights. According to the Patrol Officers, the reassignments were made in retaliation against their complaints that Customs had mistreated them.
 
 
 33
 The circuits are divided on whether the Reform Act precludes district court direct review of challenges by federal employees to personnel actions that allegedly violated their constitutional rights. A majority of the circuits that have considered the question have held that the district courts do not have such jurisdiction. See Stephens v. Department of Health and Human Servs., 901 F.2d 1571, 1576 (11th Cir.), cert. denied, 498 U.S. 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990); Saul v. United States, 928 F.2d 829, 835-40 (9th Cir.1991); Lombardi v. Small Business Admin., 889 F.2d 959, 961-62 (10th Cir.1989); Pinar v. Dole, 747 F.2d 899, 910-12 (4th Cir.1984), cert. denied, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985). Contra: see Mitchum v. Hurt, 73 F.3d 30, 35 (3d Cir.1995); Spagnola v. Mathis, 859 F.2d 223, 229-30 (D.C.Cir.1988) (en banc) (per curiam) (holding that Bivens remedy was precluded by the Reform Act but noting that "time and again this court has affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights").
 
 
 34
 This court has not decided the question. We find it unnecessary to do so in this case, however, because we conclude, as the district court did, that the amended complaint does not state a valid claim for violation of the Patrol Officers' constitutional rights. See Paige v. Cisneros, 91 F.3d 40, 44 (7th Cir.1996) ("We do not think it necessary to choose between these lines of authority [over whether the Reform Act 'affect[s] the general grant of federal-question jurisdiction in 28 U.S.C. § 1331'] because Paige lacks the sort of substantial constitutional claim that activates the rule requiring doubts to be resolved in favor of judicial review.").
 
 
 35
 The First Amendment "protects government employees from termination because of their speech on matters of public concern." Board of County Comm'rs v. Umbehr, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (emphasis in original) (citing Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); see Bernheim v. Litt, 79 F.3d 318, 327 (2d Cir.1996) (Jacobs, J., concurring) (public employee may not be demoted in retaliation for speaking on matter of public concern) (citing Rutan v. Republican Party of Illinois, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Here the record shows, as the district court held, that the Patrol Officers' statements, in retaliation for which they allegedly were reassigned, "concerned matters of private interest rather than those of public concern."
 
 
 36
 In both their original and amended complaints, the Patrol Officers' First Amendment claim, although not identified as such, was that the reassignments were "an attempt to silence the protests of the CPOs concerning (a) the denial of those job duties established for the CPO position, (b) the failure of the government to promote CPOs to Grade 11 titles, and (c) the rights to proper pay under a Fair Labor Standards Act law suit recently begun on behalf of the CPOs as well as other federal employees." Those allegations all related to the working conditions under which the Patrol Officers functioned--the nature of the work they were assigned and their pay--and are the type of matters that the Supreme Court held in Connick v. Myers to be "only of personal interest" rather than the views of "a citizen upon matters of public concern." 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).
 
 
 37
 The plaintiff in Connick had been a city assistant district attorney. Id. at 140, 103 S.Ct. 1684. She was discharged when, after having been informed that she would be transferred to try cases in a different criminal court section, she circulated a questionnaire "soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." Id. at 141, 103 S.Ct. 1684. Except for the issue of pressure on employees to work in political campaigns, the Court viewed the questions raised in the questionnaire "as mere extensions of [the plaintiff's] dispute over her transfer to another section of the criminal court." Id. at 148, 103 S.Ct. 1684. The Court declined to find speech to be of public concern that merely reflected an "employee's dissatisfaction with a transfer." Id.
 
 
 38
 Following the reasoning of Connick, courts have held that expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern. In Knowlton v. Greenwood Independent School Dist., the court held that complaints by a group of school cafeteria workers about being required to serve meals at school board meetings without pay, although relating to violations of the Fair Labor Standards Act, addressed "private, not public, concerns." 957 F.2d 1172, 1178 (5th Cir.1992). This court has distinguished between speech on matters of public concern and "an employee's essentially private complaint" about working conditions. Luck v. Mazzone, 52 F.3d 475, 477 (2d Cir.1995). In Ezekwo v. New York City Health & Hospitals Corp., we held that a physician's complaints about various aspects of her hospital residency program were not, for First Amendment purposes, matters of public concern. 940 F.2d 775, 781 (2d. Cir.), cert. denied, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). Although the quality of a physician-training program may affect the public, we concluded that the plaintiff "was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor." Id. The Patrol Officers have not shown they complained about their pre-reassignment job duties, promotion status, or pay level as part of "a mission to protect the public welfare."
 
 
 39
 The Patrol Officers state in their brief that "the forced relocation of the [Patrol Officers 'from the East Coast to the Southwest Border'] would have an adverse impact upon the safety and security of the population at large on the Eastern Seaboard of the United States." Their First Amendment claim, however, is that they were reassigned in retaliation for their prior complaints about their treatment by Customs, and by definition those complaints all antedated the reassignments. Indeed, this claim has a hollow ring in light of the Patrol Officers' assertion in their brief that "the CPOs had not been performing CPO duties for the past ten years."
 
 
 40
 The district court correctly ruled that the Patrol Officers failed to state a valid claim under the First Amendment.
 
 CONCLUSION
 
 41
 The judgment of the district court dismissing the amended complaint is affirmed.
 
 
 
 *
 Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation