OCONUS DOD EMPLOYEE RO-
TATION ACTION GROUP,
et al., Plaintiffs,

v.

William S. COHEN, Secretary,
Department of Defense,
Defendant.

No. CIV. A. 99–118(GK).

United States District Court,
District of Columbia.

March 27, 2001.

Benjamin M. Lawsky, U.S. Department of Justice, Amanda Quester, U.S. Department of Justice, Civil Division, Melissa Hart, U.S. Department of Justice, Federal Programs Branch, Susan Kay Rudy, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs are OCONUS DOD Employee Rotation Action Group ("ODERAG")—an association of approximately 250 career civil servants assigned to overseas positions with the Department of Defense—and two ODERAG members, Daniel Gasparino and Edward Vierheller. Plaintiffs bring this action to invalidate a draft of the Department of Defense Civilian Personnel Manual Subchapter 1230 ("Draft Subchapter 1230" or "Draft"), which they allege has changed the policy with respect to extensions of overseas work assignments for civilian employees. The matter is before the Court on Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") and Defendant's Cross Motion to Dismiss, or in the Alternative, for Summary Judgment ("Defendant's Motion"). Upon consideration of the motions, oppositions, replies, and the entire record herein, for the reasons stated below, Plaintiffs' Motion for Summary Judgment is denied and Defendant's Motion to Dismiss; or in the Alternative, for Summary Judgment, is granted.

## I. BACKGROUND [1]

Walter George Birkel, Tighe, Patton, Armstrong & Teasdale, Washington, DC, for Plaintiffs.

In 1966, the Department of Defense ("DOD" or "Department") established a policy pursuant to 10 U.S.C. §§ 1586(a)-(b)

1. The factual background of this case is set forth in detail in this Court's Memorandum Opinion of March 29, 2000, which granted in part and denied in part Defendant's Motion to Dismiss. Consequently, this Opinion sets forth only those facts necessary to the disposi-

that limited overseas work assignments for civilian employees to five years.[2] The five-year policy has since been revised on several occasions, most recently in 1988. The current version is contained in Civilian Personnel Manual Subchapter 301.4–2a(1) ("CPM Subchapter 301.4"). In addition to establishing a five-year limit on overseas positions, CPM Subchapter 301.4 permits local military commands to grant civilian employees extensions beyond five years to continue working overseas on a case-by-case basis, provided that an employee continues to be rated fully successful.[3] The authority to grant extensions under CPM Subchapter 301.4 is discretionary and is designed to be exercised flexibly, in order to meet the evolving staffing needs of DOD overseas. In practice, the number of extensions granted pursuant to the five-year policy has varied over the years, often fluctuating in response to the changes in active duty military forces overseas. *See* Declaration of Deputy Assistant Secretary of Defense for Civilian Personnel Policy Diane Disney ("Disney Decl.") ¶ 7.

Draft Subchapter 1230 is intended to be the latest revision of the five-year policy, and will replace CPM Subchapter 301.4, once it is promulgated. Among other things, Draft Subchapter 1230 proposes changing CPM Subchapter 301.4 by limiting extensions beyond the five-year limit to one renewal tour of duty[4] and by transferring authority to grant extensions from the local level to the major command level.

---

tion of the issues raised by the parties' pending motions.

Furthermore, as Plaintiffs have failed to comply with LCvR 7.1(h) by not submitting a statement of disputed material facts in connection with either of the pending motions, the Court considers Defendant's facts admitted. *See e.g., Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner* 101 F.3d 145, 154 (D.C.Cir.1996) ("the district court is under no obligation to sift through the record" and should "[i]nstead ... deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's Rule [LCvR 7.1(h) ] statement."). Thus, unless otherwise noted, this section sets forth facts from Defendant's Statement of Material Facts Not in Dispute.

2. 10 U.S.C. § 1586(a) provides in pertinent part that:

[It is] the policy of the Congress to facilitate the interchange of civilian employees of the Defense Establishment between posts of duty in the United States and posts of duty outside the United States through the establishment and operation of programs for the rotation, to the extent consistent with the missions of the Defense Establishment and sound principles of administration, of such employees who are assigned to duty outside the United States.

10 U.S.C. § 1586(b) authorizes the Secretary of Defense to:

establish and operate programs of rotation which provide for the granting of the right to return to a position in the United States to each civilian employee in the department concerned—(1) who, while serving under a career-conditional or career appointment in the competitive civil service, is assigned at the request of the department concerned to duty outside the United States, . . [.]

3. CPM Subchapter 301.4 provides in pertinent part:

At the request of management, extensions of the 5–year limitation of up to an additional tour of duty for the area may be granted by DOD Component concerned on an individual-case basis for employees who are rated fully successful or better; are current in the knowledge, skills, and abilities required in their jobs; and have successfully adapted to the overseas work and cultural environment. An unlimited number of additional extensions beyond 5 years, each up to an additional tour of duty for the area, may be granted as long a[s] the employee continues to be rated fully successful or better, and management certifies that the employee is current in the knowledge, skills, and abilities required in his or her job.

4. A tour of duty is the length of time of the employee's original overseas assignment.

The particulars of Draft Subchapter 1230 are still being developed.[5]

On March 26, 1997, DOD Deputy Assistant Secretary of Defense for Civilian Personnel Policy ("DASD(CPP)"), Diane M. Disney, issued a memorandum as interim guidance on overseas extensions pending the promulgation of Subchapter 1230 ("Interim Guidance"). The Interim Guidance reaffirmed that CPM Subchapter 301.4 continued to set forth the current policy on tour extensions and would remain in effect until finalization of Draft Subchapter 1230. The Interim Guidance also explained that extensions would be granted in "extremely rare situations." *See* Defendant's Memorandum of Points in Opposition to Plaintiffs' Motion for Summary Judgment and In Support of Defendant's Cross Motion to Dismiss, or in the Alternative, for Summary Judgment ("Def.'s Mot.") at Ex. 5.

Plaintiffs allege that, in response to the Interim Guidance, several military commands, including U.S. Army Europe ("USAREUR") and U.S. Air Force Europe ("USAFE"), have begun implementing Draft Subchapter 1230. In particular, they claim that military commands have reduced the number of civilian employees remaining overseas more than five years and have granted extensions beyond five years only in increasingly rare circumstances. *See* Compl. Exs. G–I; Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Cross Motion to Dismiss, or in the Alternative, for Summary Judgment ("Pls.' Opp'n") at 21–25.

Plaintiffs move for summary judgment, and ask the Court to find as a matter of law that Draft Subchapter 1230 is "arbitrary and capricious" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Defendant cross-moves to dismiss Plaintiffs' challenge due to lack of finality, ripeness and standing, and for summary judgment on the ground that Draft Subchapter 1230 is not arbitrary and capricious.

## II. STANDARD OF REVIEW

█  Both parties have moved for summary judgement. Defendant, however, has styled its motion as a Motion to Dismiss or, in the Alternative, for Summary Judgment. In support of its motion, Defendant submitted and relied upon several documents outside the pleadings. Accordingly, Defendant's Motion will be treated as a Motion for Summary Judgment. Fed. R.Civ.P. 12(b).

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. ANALYSIS

### A. The Court Lacks Jurisdiction [6]

██  Defendant argues that the Court lacks subject matter jurisdiction because:

---

5. Between January and September 1998, DOD received comments on Draft Subchapter 1230 from within the Department. Between February 1998 and March 1999, DOD revised Draft Subchapter 1230 based on these comments. On February 15, 2001, the Director of the Civilian Personnel Management Service circulated a revised working draft of Subchapter 1230 to the Directors of Civilian Personnel Policy for comments. DOD plans another internal solicitation of comments on the revised draft in the upcoming months. *See* Def.'s Submission of March 15, 2001, in Response to the Court's March 5, 2001 Order ("Def.'s Submission of March 15, 2001").

6. Plaintiffs argue that the Court's March 29, 2000 Memorandum Opinion, which held that Draft Subchapter 1230 constitutes final agency action, is the law of the case and bars all of Defendant's jurisdictional arguments. The Court's Opinion, however, is not the law of

(1) Draft Subchapter 1230 does not constitute "final agency action" for purposes of the APA; (2) Draft Subchapter 1230 is not ripe for review; and (3) Plaintiffs lack standing to challenge Draft Subchapter 1230. Plaintiffs oppose Defendant's arguments in their entirety and, in the alternative, request jurisdictional discovery pursuant to Fed.R.Civ.P. 56(f).

■ As a preliminary matter, the Court denies Plaintiffs' request for jurisdictional discovery. Plaintiffs seek information that is entirely unrelated to the jurisdictional issues raised by Defendant. Plaintiffs' request provides in full:

> If permitted discovery, plaintiffs would obtain documents which include, among others, the adverse and other comments received by the DOD in the course of the two years since the Rule was implemented; statistical documentation of the disparate age impact of the Rule, the inability of the DOD to fill vacated positions with either new hires or military spouses, the lack of statistical showing that new hires for "future leaders" of DOD or military spouses are going unfulfilled; and documents which show that DOD has been obligated to offer cash bounties to fill positions abroad and has otherwise not been able to fill the positions vacated by Plaintiffs and career-civil servants similar to them who have been involuntarily rotated by the Rule. I would also seek information that refutes the notion that "over 5'ers" do not maintain currency in skills, are assisted in this respect by forced rotation, as well as data showing that the Priority

Placement Program often discriminates against these employees.

Plaintiffs' Rule 56(f) Affidavit at ¶ 5. All of the requested information appears to be directed at the substantive merits of the five-year policy (*i.e.*, whether the policy satisfies DOD's objectives). None of this information relates to the jurisdictional issues of the finality of the agency action, ripeness or standing. Accordingly, Plaintiffs' jurisdictional discovery request is **denied**.

### 1. Draft Subchapter 1230 is not "Final Agency Action"

■ Judicial review under the APA is limited to review of final agency action. 5 U.S.C. § 704. For agency action to be final, it "must mark the consummation of the agency's decisionmaking process," and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations and internal quotation marks omitted).

■ On March 29, 2000, this Court ruled that for purposes of Defendant's Motion to Dismiss, where Plaintiffs' allegations must be taken as true, Draft Subchapter 1230 was final agency action. In particular, the Court accepted as true representations that Draft Subchapter 1230 was being implemented by various military commands, that DOD had completed the process of developing Draft Subchapter 1230, and that DOD had no plans to change it. Defendant, however, now offers

the case because it is an interlocutory ruling. *See e.g., Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C.Cir.1997). Moreover, the posture of this case, now at the summary judgment stage, has changed. Defendant has submitted uncontroverted evidence rebutting Plaintiffs' allegations and establishing that Draft Subchapter 1230 is not final. *See* sec-

tion III.A.1 *infra*. Furthermore, Defendant is asking the Court to rule for the first time on ripeness and standing, which are separate legal arguments from the finality of agency action addressed in the Court's Opinion. Accordingly, the law of the case doctrine does not bar Defendant's jurisdictional arguments.

uncontroverted evidence in support of its Motion for Summary Judgment to establish that Draft Subchapter 1230 is not final agency action.

For example, DOD offers undisputed evidence showing that Draft Subchapter 1230 remains in the process of revision. Between January and September 1998, DOD received comments and/or approvals from within DOD on Draft Subchapter 1230 and incorporated these changes into another version of the Draft between February 1998 and March 1999. *See* Disney Decl. ¶¶ 17–18. On February 15, 2001, the revised working Draft was circulated to the Directors of Civilian Personnel Policy for comments. DOD is currently planning a second distribution within the Department of the newly revised Draft Subchapter 1230 for comments. Disney Decl. ¶ 19; *see* Def.'s Submission of March 15, 2001.

Plaintiffs argue that Draft Subchapter 1230 should still be deemed final agency action, notwithstanding the on-going revisions, because military commands are, in practice, following its substance by granting fewer extensions and permitting only senior level officials to approve tour extensions. However, even if these changes are occurring, they are being undertaken pursuant to CPM Subchapter 301.4, embodying DOD's current policy, and not Draft Subchapter 1230.

For example, two DASD (CPP) Memoranda issued in March of 1997 state explicitly that CPM Subchapter 301.4 will remain in effect until Draft Subchapter 1230 is promulgated. *See* Def.'s Mot. at Exs. 4–5. Plaintiffs' own exhibits confirm that CPM Subchapter 301.4 is the current policy in place. *See* Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment ("Pls.Mot.") at Exs. 3, 13. As a result, local military commanders are authorized under CPM Subchapter 301.4 to grant case-by case tour extensions exceeding one renewal tour of duty. *See* Disney Decl. ¶ 2. Such extensions, which continue to be granted, would contravene the terms of Draft Subchapter 1230 if that proposed policy were currently in effect. *See* Declaration of Toni B. Wainwright, Director of Civilian Personnel for U.S. Army Europe (USAREUR) ("Wainwright Decl.") ¶¶ 5, 9. Furthermore, any recent reduction in the number of extensions by local military commands is entirely consistent with CPM Subchapter 301.4, which permits the discretionary award of extensions based on changing mission requirements. *See* Disney Decl. ¶¶ 4, 7–8.

Accordingly, because the undisputed facts show that Draft Subchapter 1230 is in the process of being developed and is not the policy currently in effect, it does not constitute "final" action for APA review.

### 2. Draft Subchapter 1230 Is Not Ripe for Review

■ Defendant also argues that Draft Subchapter 1230 is not ripe for review. Ripeness depends on "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ First, Draft Subchapter 1230 is not fit for review. As explained in the foregoing section, Draft Subchapter 1230 is still being revised. Indeed, the version of Draft Subchapter 1230 that was challenged when this Complaint was filed has already been revised and may be changed further after it is redistributed for comments within DOD. *See* Disney Decl. ¶¶ 17–19. Judicial review at this point "would benefit from a more concrete setting," and there is obviously no point in evaluating the legali-

ty of a Draft policy which is subject to on-going revision. *See Continental Air Lines, Inc. v. Civil Aeronautics Board,* 522 F.2d 107, 125 (D.C.Cir.1974); *see also Cronin v. Federal Aviation Admin.,* 73 F.3d 1126, 1131 (D.C.Cir.1996)(factors in determining fitness include whether the question is purely legal, whether the court would benefit from a more concrete setting and whether the decision is final).

█ Second, Plaintiffs suffer no hardship from the existence of Draft Subchapter 1230. Plaintiffs argue that Draft Subchapter 1230 has resulted in denials of many extensions of overseas tours of duty, causing significant hardship to the professional and personal lives of those affected. While Plaintiffs' claims of hardship are by no means insignificant, all changes in the practice of granting extensions of overseas tours of duty have been made pursuant to CPM Subchapter 301.4, not Draft Subchapter 1230. Thus, Plaintiffs' hardship derives from application of CPM Subchapter 301.4, not Draft Subchapter 1230.

Accordingly, given that Draft Subchapter 1230 is not "fit for review" and that there is no "hardship" deriving from a delay in review, the Court concludes that Draft Subchapter 1230 is not ripe for review.

### 3. Plaintiffs Lack Constitutional Standing

█ Defendant argues that Plaintiffs lack standing to challenge Draft Subchapter 1230. To have standing, Plaintiffs must allege: (1) an injury in fact that is concrete and particularized and "actual or

imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of" and (3) that it is "likely" rather than merely speculative that the injury will be redressed by the relief requested. *See e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(internal quotations omitted). Plaintiffs fail to establish standing in this instance because their injury is "conjectural or hypothetical."

█ As explained in the foregoing sections, Draft Subchapter 1230 has not yet been fully formulated, finalized or implemented. Any injury Plaintiffs currently claim derives from CPM Subchapter 301.4 and local command interpretations thereof. Thus, the only injury traceable to Draft Subchapter 1230 is the possibility that Plaintiffs will be unlawfully denied extensions of tours of duty sometime in the future based on Draft Subchapter 1230 once it is revised and promulgated. This injury is purely "conjectural and hypothetical." Accordingly, Plaintiffs lack standing to challenge Draft Subchapter 1230.

In sum, because the undisputed facts show that Draft Subchapter 1230 is not final agency action and not ripe for review, and that Plaintiffs lack standing, the Court concludes that it lacks subject matter jurisdiction over Plaintiffs' claims.

### B. Draft Subchapter 1230 is not Arbitrary and Capricious[7]

Even assuming subject matter jurisdiction, the record demonstrates that Plain-

---

7. In their motion papers, Plaintiffs analyzed Draft Subchapter 1230 under the framework established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron,* however, is inapplicable to the instant case, as *Chevron* is principally concerned with

whether an agency has authority to act under a statute, and whether the agency's construction of the statute is faithful to its plain meaning or "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 842–843, 104 S.Ct. 2778. Here, the authorizing statute gives DOD express authority to exer-

tiffs' challenge to Draft Subchapter 1230 fails as a matter of law.

 An agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this finding, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). If the "agency's reasons and policy choices ... conform to 'certain minimal standards of rationality' ... the rule is reasonable and must be upheld", *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted), even though the Court itself might have made different choices.

Applying these standards, it is clear that Draft Subchapter 1230 withstands APA review. Draft Subchapter 1230 would effect two changes in the current policy: it would eliminate the authority of local supervisors to grant extensions, authorizing only the major command level to grant extensions beyond five years; it would also allow only one extension to be granted beyond five years. *See* Disney Decl. ¶ 12. Both of these changes have a rational basis.

The first change is designed to minimize personal influence and maximize objectivity in personnel staffing matters. Currently, local management officials have the authority to rule on the extensions of their friends and close associates. DOD believes that keeping the authority at a higher level ensures that extensions are made based on DOD mission requirements. *See* Disney Decl. ¶ 13.

The second proposed change—prohibiting extensions beyond one renewal tour of duty—is related to the downsizing or "drawdown" of active duty forces abroad and the concomitant decline in the number of available overseas positions for civilians. Overseas experience is critical to the career development of DOD employees. *Id.* ¶¶ 15–16. With fewer positions available overseas, DOD believes that it is necessary to rotate personnel in such positions more frequently so that a greater number of DOD employees have the opportunity to work overseas, as is contemplated by 10 U.S.C. § 1586.

Opening up overseas positions also ensures that employment opportunities are available to the increasing number of spouses of servicemembers who are stationed abroad. Providing employment opportunities to them is essential to the recruitment and retention of active duty personnel, as military spouses are increasingly entering the workforce. *Id.* More-

---

cise its discretion to establish a rotation policy that facilitates the "interchange of civilian employees" between posts in the United states and those abroad pursuant to 10 U.S.C. 1586(a). *See* 10 U.S.C. 1586(b)-(c). As such, this case does not pose a question of whether DOD "permissibly interpreted" the authorizing statute in establishing Draft Subchapter 1230. The only issue here is whether DOD's exercise of its discretionary authority in creating a rotation policy that limits tours of duty to five years with few exceptions is reasonable. Accordingly, the question falls within the province of traditional arbitrary and ca-

pricious review. *See e.g., Arent v. Shalala,* 70 F.3d 610, 616 (D.C.Cir.1995) (arbitrary and capricious review, not *Chevron,* applies as the FDA had authority under the Nutrition Labeling and Education Act to interpret statute and the only question was whether FDA's discharge of authority was reasonable); *OSG Bulk Ships Inc. v. United States,* 132 F.3d 808, 812 n. 7 (D.C.Cir.1998)(when Congress has expressly delegated authority to the agency to elucidate a specific provision of the statute by regulation, the ensuing regulations are reviewed pursuant to the arbitrary-or-capricious standard).

over, DOD believes that limiting extensions to one renewal tour of duty will ensure that its employees abroad do not lose their skills, especially in the technology area. *Id.*

Plaintiffs respond to Defendant's arguments with a litany of criticisms of Draft Subchapter 1230. As a preliminary matter, it should be noted that most of Plaintiffs arguments are directed at the substantive basis for the proposed five-year policy, rather than the legality of DOD's reasoning or decision-making process. The role of the Court, however, is not to undertake a *de novo* scrutiny of the substantive merits of a civilian personnel policy. The expertise for that task lies exclusively with DOD and the executive branch. The role of the reviewing court is merely to assess whether DOD:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Furthermore, the Court exercises a special deference in cases involving matters of military management. *See Doe v. Sullivan,* 938 F.2d 1370, 1380 (D.C.Cir.1991); *Dilley v. Alexander,* 603 F.2d 914, 919–920 (D.C.Cir. 1979). With these principles in mind, the Court turns to the particulars of Plaintiffs' arguments.

First, Plaintiffs dispute that overseas employees will lose currency in skills if they remain abroad indefinitely. They also disagree that overseas positions foster professional development or improve op-

portunities for spouses of servicemembers. *See* Pls. Opp'n at 25–27. Plaintiffs, however, have offered no evidence to substantiate their bald factual assertions.

Second, Plaintiffs argue that the positions vacated pursuant to Draft Subchapter 1230 will remain vacant, thereby defeating DOD's goal of rotating a wider range of civilian employees into overseas positions. In particular, Plaintiffs assert that: (1) the five-year policy applies only to GS–12 positions or higher, and thus, qualified and experienced replacements are difficult to find; (2) the lengthy security clearance process and the five-year limit deter candidates from applying; and (3) military spouses—the group of employees DOD hopes to assist—lack the credentials for the positions that will be made available. Plaintiffs claim that as a result, DOD has already been forced to consider signing bonuses to attract candidates to overseas assignments, and that those assignments will remain unfilled.

Again, the record reveals no evidence supporting Plaintiffs' factual assertions. Furthermore, Defendant has offered evidence, which Plaintiffs have not disputed, showing that Draft Subchapter 1230 applies to a wide range of grade levels, including those positions lower than GS–12; that military spouses are competitive for these positions; that overseas tours of duty assist in career development; and that on the whole, U.S.-based civilian employees have better access to training than their counterparts stationed overseas. *See* Disney Decl. ¶¶ , 9, 15(b)–16

Third, Plaintiffs argue that Draft Subchapter 1230 constitutes a form of age-discrimination because it will have a disproportionate impact on older employees. Again, Plaintiffs present no competent evi-

dence substantiating this claim.[8] Furthermore, Draft Subchapter 1230 applies equally to all non-exempt employees regardless of age, applies to all positions below the GS-6 level, not only to higher level positions likely to be held by senior employees, and was drafted by DOD for reasons entirely unrelated to age. *See id.* ¶¶ 12–16; Def.'s Mot. at Exs. 5, 8.

Fourth, Plaintiffs complain that the draft policy is arbitrary and capricious because employees forfeited their rights to return to their previous positions in the United States with the understanding that their tours abroad would be indefinitely extended. However, since 1966, DOD has consistently required all persons recruited for career status positions overseas to sign a rotation agreement providing that if employees wish to continue working for DOD, they must either exercise their right to return within five years or enroll in the Priority Placement Program thereafter ("PPP").[9] *See* Compl. ¶ 13 & Ex. A; Answer ¶ 13.

Finally, Plaintiffs argue that Draft Subchapter 1230 is arbitrary and capricious because it is not in compliance with various laws and DOD Directives. Defendant, however, offers uncontroverted evidence showing that Draft Subchapter 1230 was developed in compliance with all applicable laws and DOD Directives.[10]

■ First, contrary to Plaintiffs' assertion, the draft policy was developed after consultation with the Civilian Personnel Policy Council, as required by DOD Directive 1400.24 § 3.1 and DOD 1400.25–M Chapter 100 § B. 1.a. *See* Disney Decl. ¶ 9. Second, the Draft Subchapter 1230 does not violate DOD's requirement that civilian management authorities be delegated to the "lowest practical level." *See* DOD 1400.24 § 3.8. Draft Subchapter 1230 reflects DOD's considered judgment that the major command level is the lowest practical level at which objectivity in tour extensions can be assured. *See* Disney Decl. ¶ 13.

■ Third, Plaintiffs have offered no evidence showing how Draft Subchapter 1230 might violate DOD 1400.24 § 3.10, which concerns "merit systems principles, equal compensation and employment opportunities, and workforce diversity goals and objectives." The policy does not discriminate against any particular group, but rather, is aimed at ensuring that overseas rotations are broadly available to a wider range of DOD employees. *See* Disney Decl. ¶ 15.

8. Plaintiffs' only submission on this issue is a table received through a FOIA request entitled "Number of Civilians Located Outside CONUS by Age and Years of Service As of June 1998." *See* Pls.' Affidavit of Walter G. Birkel at Ex. 7. Plaintiffs admit that they do not know the source of the table or the meaning of the data presented therein. *See* Pls.' Mot. at Ex. 17. Consequently, the Court considers this table of no probative value.

9. DOD created PPP in the 1970s to find new positions for civilian employees returning from overseas who had lost the right to return to their previous positions, and for employees whose grade had increased while they were overseas and who therefore chose not to re-

turn to their previous, lower grade positions. Under PPP, employees returning to the United States select a geographical area of the United States in which they want to work. If they do not receive an offer of DOD employment with the same seniority, status, and tenure (although not necessarily the same position) held prior to their overseas employment within that geographical area, they must chose another area in which they are willing to accept work. *See* Def.'s Mot. at 4; Compl. ¶ 13.

10. Administrative rules involving personnel matters are specifically excluded from APA's notice and comment provisions. 5 U.S.C. § 553(a)(2).

Fourth, the policy is not an improper reduction in workforce ("Reduction in Force" or "RIF"). RIF occurs where an agency terminates its employees to reduce the size of its work force. *See Tiltti v. Weise,* 155 F.3d 596, 601 (2d Cir.1998). Draft Subchapter 1230 facilitates the rotation of personnel in overseas positions; it does not eliminate positions nor reduce the size of the workforce, and consequently, compliance with RIF regulations is not required.

Finally, contrary to Plaintiffs' assertions, DASD (CPP) and the Deputy Assistant Secretary of Defense for Force Management Policy are vested with policy-making authority related to personnel matters, and acted within the sphere of their authority in developing Draft Subchapter 1230. *See* DOD 1400.25–M Chapter 100 § C.1.a & c.; DOD Directive 1400.25 § 4.1.

Given that the uncontroverted evidence establishes that DOD acted reasonably in formulating Draft Subchapter 1230, and that the Draft has a rational basis, the Court concludes that Draft Subchapter 1230 is not arbitrary and capricious.

### C. The Interim Guidance is Not Arbitrary and Capricious

Plaintiffs argue for the first time—in a footnote in their Opposition to Defendant's Motion—that they are also challenging the Interim Guidance, in addition to Draft Subchapter 1230, as arbitrary and capricious. *See* Pls.' Opp'n at 22 n. 7. Specifically, they contend that the Interim Guidance changed the five-year policy because it provided that extensions beyond the five-year limit would be granted only in "extremely rare situations."

Plaintiffs' challenge to the Interim Guidance fails for several reasons. First, the challenge is outside the scope of this suit, as Plaintiffs have repeatedly represented that the relief they seek is invalidation of Draft Subchapter 1230. *See* Pls.' Notice of Mot. for Sum. J.; Pls.' Mot. at 1.

Second, because the Interim Guidance is DOD's interpretation of its own rule, namely CPM Subchapter 301.4, it cannot be set aside unless it is plainly erroneous or inconsistent with the terms of the rule. *See e.g., Davis v. Latschar,* 202 F.3d 359, 365 (D.C.Cir.2000). The Interim Guidance is clearly not inconsistent with CPM 301.4. In fact, the Interim Guidance expressly reaffirmed that CPM Subchapter 301.4 set forth the criteria for granting extensions. *See* Def.'s Mot. at Ex. 5. Moreover, even though the Interim Guidance states that extensions should be "extremely rare," this language is consistent with CPM Subchapter 301.4, which provides for the discretionary grant of extensions based on evolving staffing needs. *See* Disney Decl. ¶¶ 4, 7–8. Indeed, the number of extensions granted pursuant to the five-year policy has always fluctuated depending on mission needs, and the liberal grant of extensions Plaintiffs urge has never been the policy or the practice. *Id.*

Finally, even if the "extremely rare" language were to constitute a change in the long-term policy with respect to extensions, the Interim Guidance is not arbitrary or capricious for the reasons articulated in section III. B *supra.* That is, the Interim Guidance is a reasonable response to: (1) the decline in the number of overseas positions as a result of the drawdown of active duty forces; and (2) DOD's goals to provide overseas employment opportunities and career development for civilian employees based in the United States; to increase employment opportunities for spouses of military members; and to ensure that civilian employees maintain their professional skills, especially technology skills. In view of these considerations,

the Interim Guidance cannot be considered arbitrary and capricious.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied, and Defendant's Cross–Motion for Summary Judgment is **granted**. An Order will issue with this Opinion.

### ORDER

The matter is before the Court on Plaintiffs' Motion for Summary Judgment and Defendant's Cross Motion to Dismiss, or in the Alternative, for Summary Judgment. Upon consideration of the motions, oppositions, replies, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED, that Plaintiffs' request for jurisdictional discovery is denied; it is further

ORDERED, that Plaintiffs' Motion for Summary Judgment is denied [# 26]; it is further

ORDERED, that Defendant's Cross Motion to Dismiss, or in the Alternative, for Summary Judgment [# 34], is granted